IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| SCI Illinois Services, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | No. 05 C 4345 |
| v. | ) | |
| | ) | Hon. Mark Filip |
| Auto Livery Chauffeurs, Embalmers, | ) | |
| Funeral Directors, Apprentices, Ambulance | ) | |
| Drivers and Helpers, Taxicab Drivers, | ) | |
| Miscellaneous Garage Employees, Washers, | ) | |
| Greasers, Polishers and Wash Rack | ) | |
| Attendants Union, Local 727, an affiliate of | ) | |
| the International Brotherhood of Teamsters, | ) | |
| Chauffeurs, Warehousemen and Helpers of | ) | |
| America, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER GRANTING JUDGMENT
## TO DEFENDANT, UNION LOCAL 727, FOLLOWING EVIDENTIARY HEARING

This case is the consolidation of two cases, both disputing the proper interpretation of a

grievance provision in a collective bargaining agreement. The first case was brought by Plaintiff,

SCI Illinois Inc. ("SCI"), to compel arbitration of a grievance between SCI and Defendant, Auto

Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers,

Taxicab Drivers, Miscellaneous Garage Employees, Washers, Greasers, Polishers, and Wash

Rack Attendants Union, Local 727, an affiliate of the International Brotherhood of Teamsters,

Chauffeurs, Warehousemen and Helpers of America ("Defendant" or "Union"). (*See* D.E. 1.)

The second case was brought by Defendant to enforce an award already issued by a Grievance

Board in the same grievance. (*See* Case No. 05-C-4361, D.E. 1.) Defendant sued under the

Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, *et seq.*, and the Labor Management Relations Act ("LMRA"), 29 U.S.C. Section 185(a); Plaintiff's suit is under the LMRA and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. (*Id.*)

The parties made cross-motions for summary judgment. (*See* D.E. 21; D.E. 28.) In them, the Union argued that the Grievance Board's decision was binding on the parties pursuant to Article 18 of their 2002 Collective Bargaining Agreement ("2002 CBA"), to which the parties agree they are bound. (*See* D.E. 20-1 ¶¶ 6, 9.) Conversely, SCI claimed that the Grievance Board's decision was not binding and that SCI is entitled to arbitration pursuant to Article 18 of the 2002 CBA. (*See, e.g.*, D.E. 28 at 5.) The Court denied both of those summary judgment motions without prejudice. (D.E. 35.) The Court found that, based on the text of the relevant CBA alone, it could not fairly render summary judgment in favor of either party. (*Id.* at 2.) The Court found that both sides presented textually plausible positions, and they each presented broader extrinsic evidence that at least potentially could be understood to support their interpretive contentions. (*Id.* at 4.) As a result, the Court denied both of the competing summary judgment motions without prejudice, and held a live evidentiary hearing at which the parties were able to present evidence, including live testimony, on the questions at issue. (*Id.*; D.E. 43.)

As the Court has previously explained, this is a case where both sides have respectable interpretive positions as a textual matter, even if neither position is a decisive winner. However, the weight of federal caselaw, including a consensus of district court decisions from this district and elsewhere, favors the Union. The weight of evidence presented at the hearing also favored the Union: it presented several witnesses, including leading CBA negotiators from both the labor and management side, and including one of SCI's own employees, all of whom support the Union's contention about the meaning and operation of the relevant CBA. As a result, based on

the evidence presented at the hearing and the parties' briefing of the issues, the Court, for the

reasons explained below, grants judgment in favor of the Union and against the employer, SCI.

## FACTS

### I.    General Introduction

The Court takes the facts from the parties' Joint Pre-Trial Statement of Uncontested

Material Facts ("Joint Statement"), their Joint Trial Exhibits, their respective Rule 56.1 filings,[1]

and the evidence presented at the hearing. (D.E. 20-1; D.E. 27.) There are generally not

sweeping factual disagreements; however, to the extent there are factual disagreements, all

evidence and inferences therefrom credited in favor of the Union, unless specifically noted

below.

By way of introduction, the underlying dispute in the case relates to SCI's laying off of

certain workers. (Hrg. Tr. at 118.) The Union filed a grievance against SCI, as discussed further

below, claiming that it violated the 2002 CBA because SCI laid off two more-senior

employee/funeral directors, in favor of two less-senior employee/funeral directors who spoke

Spanish. (*See* D.E. 35 at 1.) As also discussed further below, a six-person Grievance

Board—composed of three individuals selected by the Union and three individuals selected by

the Funeral Directors Association of Greater Chicago (a multi-employer organization that

bargains with the Union and of which SCI was a member)—unanimously found that this practice

violated the 2002 CBA. (Hrg. Joint Ex. 24.) The Grievance Board rendered its unanimous

decision in the Union's favor, ordering that the two more-senior, laid-off employees should be

---

[1] The Court will accept the parties' agreement concerning factual issues where the Local Rule 56.1 papers reflected factual consensus. *Accord* D.E. 35 at 1 (explaining that the summary judgment filings would be used in connection with the evidentiary hearing).

reinstated with back pay and benefits. (*Id.*) The dispute here concerns whether that unanimous Grievance Board decision is the end of the matter under the CBA, or whether the employer, SCI, is entitled to further arbitration on the issue.

## II.    The Specific Facts Concerning the Dispute

Defendant Union represents employees, including funeral directors, embalmers, and chauffeurs, for the purposes of collective bargaining and is a labor organization within the meaning of 29 U.S.C. § 152(5). (Joint Statement ¶ 3.) Plaintiff SCI manages funeral services throughout Illinois and is an "employer" for purposes of 29 U.S.C. § 152(2). (*Id.* ¶ 4.) At all times relevant to this case, the Union has served as the exclusive collective bargaining representative of a unit of SCI's employees at some of its funeral homes in the Chicago area. (*Id.* ¶ 5.) SCI was a member of the Funeral Directors Services Association of Greater Chicago (FDSA), a multi-employer association that collectively bargains with the Union on behalf of employers; in this regard, SCI was covered by the 2002 CBA between the Union and the FDSA. (*Id.* ¶ 6.)

This case arose when SCI laid off eleven employee/funeral directors, all of whom were Union members. (D.E. 27 ¶ 7.) Around April 18, 2005, the Union filed a grievance against SCI claiming that these layoffs violated the 2002 CBA because two employee/funeral directors with more seniority were laid off in favor of two more junior employee/funeral directors who spoke English and Spanish. (*Id.* ¶ 8; D.E. 34 ¶ 7.) On or about June 9, 2005, the six-member labor and management Grievance Board met regarding the grievance. (Joint Statement ¶ 17.) The Grievance Board rendered a unanimous decision in the Union's favor on or about June 14, 2005 (Hrg. Joint Ex. 24), and it sent a "letter to confirm a decision of the Grievance Board" to the Union and SCI. (*Id.*; Joint Statement ¶ 18.) The letter stated "that the Employer violated the

Agreement" and issued an "order" to SCI to take remedial steps in the form of reinstating the "bargaining unit employees who where laid off out of seniority order" with back pay and benefits. (Joint Statement ¶ 19; Hrg. Joint Ex. 24.) On June 30, 2005, SCI notified the Union in writing that it objected to the decision and asked the Union for clarification of its interpretation of the decision. (Joint Statement ¶ 20.) On July 13, 2005, SCI notified the Union that, "[i]f it is your position that the company cannot come into compliance . . . it will be necessary to commence arbitration proceedings to resolve this matter." (*Id.* ¶ 21.) SCI reiterated its request for arbitration on July 19, 2005 (*id.* ¶ 22), and filed this suit on July 28, 2005 (*see* D.E. 1). Defendant subsequently filed a separate action, Case No. 05 C 4361, seeking enforcement of the Grievance Board's decision. (*See* D.E. 9, Ex. B.) Pursuant to local rules, the case was transferred to this court and the cases were consolidated into this proceeding, under the first-filed case number. (*See* D.E. 14.)

The parties' disagreement centers around the proper interpretation of Article 18 of the 2002 CBA. Some background hopefully will illuminate the parties' dispute. The wording of Article 18 was new to the 2002 CBA. Prior to that agreement, and from at least the early 1960s, the Union and the FDSA were party to two separate CBAs: one for funeral directors and embalmers, and one for chauffeurs. (*See* D.E. 20-1 ¶ 19; D.E. 27 ¶ 19.) Under those CBAs, everyone agrees, a majority decision of the Grievance Board was "final and binding," and there were no further arbitration proceedings that were available. (*See, e.g.*, Hrg. Tr. at 17, 152.) Those agreements further provided that a grievance "shall not be disposed of if there is a failure to obtain a majority vote." (*See, e.g.*, Hrg. Joint Ex. 6 at 13 (1997–2002 CBA covering funeral directors and embalmers, Art. XI, § 2.3); Hrg. Joint Ex. 12 at 21 (1998–2003 CBA covering livery chauffeurs, Art. XII, § 2.3).) Furthermore, those agreements stated that, "[i]f a grievance is

5

not finally disposed of by the Grievance Board," the Union or the FDSA could request arbitration, which would also be "final and binding." (*See* Hrg. Joint Ex. 6 at 13 (Art. XI, § 3); Hrg. Joint Ex. 12 at 21 (Art. XII, § 3).)

In 2002, the Union and the FDSA agreed to combine these two separate CBAs, which expired at different times each year, into one agreement. (Joint Statement ¶ 12.) While negotiating the 2002 CBA, the parties formed a sub-committee to merge the language from the two pre-existing CBAs, including the grievance and arbitration language. (*Id.*) Members of the FDSA and the Union who actually negotiated the 2002 CBA testified at the hearing that this merger was meant to update and simplify—to streamline the language—but not to change the procedure. (*See, e.g.*, Hrg. Tr. at 33, 66, 109–10; *see also id.* at 118–19, 137, 139.)

More specifically, a number of witnesses—including leading negotiators of the 2002 CBA from the Union and from management (the latter of whom testified pursuant to Union subpoena)—offered credible testimony about the content of the negotiations, the intent of the parties, and their understanding of how the grievance procedure works under the 2002 CBA. All of this testimony supported the Union. For example, John Coli, the Secretary Treasurer of the Union Local, who has been an officer of the Local for more than twenty-five years, and who was the lead Union CBA negotiator for some fifteen years (Hrg. Tr. at 6–7), testified about the 2002 CBA and its predecessors. Mr. Coli explained that, under the pre-2002 CBAs, if the Grievance Board made a majority decision about a grievance, then "the case was resolved." (*Id.* at 17.)[2] Mr. Coli also explained that during the negotiation of the 2002 CBA,

---

[2] Mr. Coli also explained that part of his job was to appoint Grievance Board members and he also sat at times on Grievance Boards. (*Id.* at 17–18.)

6

> verbally in negotiations I did say across the table to FDSA [the management entity of which Plaintiff is a member] that it was not our intention to change the way that the Grievance and Arbitration procedures operated. And the other side of the table echoed that sentiment too.

> It was discussed across the table that we were doing this to simply update and modernize the language [concerning the grievance process], not to change the way it operated. And that was verbally spoken across the table between the parties.

(*Id.* at 33[3]; *see also id.* at 30 (explaining that there never was any discussion of changing the binding effect of a majority vote of the Grievance Board concerning a grievance.) Mr. Coli also explained that his understanding of the effect of the 2002 CBA was that a majority vote of the Grievance Board is conclusive, and that the Union has acted in conformity with that understanding in the one instance under the 2002 CBA where a majority vote was entered against the Union's position. (*Id.* at 19–20.)

Ms. Becky Strzechowski, the business manager of Defendant since 2000, and currently its Vice-President (*id.* at 51), also testified. Mr. Strzechowski, an attorney, has been centrally involved with the Union grievance and Grievance Board process for the past several years, and more generally involved in the process for some twenty years. (*Id.* at 53, 93.) She also was on

[3] The Court found this testimony of Mr. Coli to be credible. In so finding, the Court acknowledges that other witnesses who helped negotiate the 2002 CBA recollected only that there were no discussions of changing the substantive effect of a majority vote of the Grievance Board. (*See, e.g.,* Hrg. Tr. at 109.) It is not surprising that not everyone would recollect the detail that Mr. Coli did, and the Court believed him in his testimony. Moreover, even if the Court were to put aside his testimony, as well as generally similar testimony from Ms. Becky Strzechowski (discussed further below), the testimony at the hearing made clear that lead negotiators for both the Union and for management intended no change in the grievance procedure with respect to majority votes of the Grievance Board under the 2002 CBA. In other words, the procedure was to remain the same as it had been for decades. It was also clear that those Union and management leaders all believe that the Union's interpretation of the 2002 CBA put forward in this case is the correct one.

the Union negotiating committee for the 2002 CBA. (*Id.* at 54.) Ms. Strzechowski explained

that she took the grievance-procedure language for the draft 2002 CBA in "cut and past[e]

fashion from the CBA for the parking industry, where the Union also represents employees. (*Id.*

at 61.) Under the parking industry's grievance procedure, the equivalent of a Grievance Board

consists of one Union representative and one management representative. If the two members of

this grievance body agree, the matter is resolved and there are no further arbitration proceedings

available. (*Id.* at 63–64.) In response to a question about whether she recalled any discussions

with management representatives about the Grievance Board provisions during the negotiations

for the 2002 CBA, Ms. Strzechowski testified that,

> I remember when we presented the language discussing the intent of the Union was to
> simply simplify the language [of the old CBAs], that we weren't trying to change the
> entire procedure because on the face it looks somewhat like that, the language is very
> different, but in reality what we were trying to do is present a simpler procedure that was
> working in a different industry [*i.e.*, the parking industry], and I know this was
> specifically discussed at negotiations, that we do have this in a different industry that has
> many, many more grievances generated under it, and we found that it was working well in
> that industry. So we proposed it in this industry as well.

(*Id.* at 66.) Ms. Strzechowski explained that there were some differences between the parking

industry agreement and the pre-2002 CBAs between the parties—concerning matters not at issue

in the cases *sub judice*, such as whether the parties would henceforth each use only one

Grievance Board representative as opposed to three for scheduling convenience. (*Id.* at 67.[4])

---

[4] Contrary to the tenor of some of SCI's arguments in the post-hearing briefing,
negotiations concerning the 2002 CBA were, not surprisingly, vigorously pursued by both the
Union and FDSA, the management-side group representing, *inter alia*, the Plaintiff SCI. While
the Union may have been in primary control of the merged documents, the record reflected that
both sides proposed changes. (*E.g.*, Hrg. Tr. at 76). Moreover, as discussed throughout this
opinion, it is clear that neither side intended to alter the longstanding binding effect of a majority
vote at the Grievance Board, and equally clear that neither management nor Union negotiators
understood the CBA to have altered the longstanding practice between the parties to the 2002
CBA.

However, there were no discussions of changing the function of the Grievance Board (*id.* at 84), which always had the power to resolve grievances if a majority of the Union and management representatives agreed about how the issue should be resolved under the applicable CBA.

Robert Sheehy, the President of Robert Sheehy & Sons Funeral Home, also was subpoenaed to testify by the Union. (*Id.* at 107.) It was clear from Mr. Sheehy's demeanor that he was not thrilled to testify in support of the Union's position. This enhanced his credibility, and his testimony was decidedly in the Union's favor. Mr. Sheehy explained that his family company has been a member of the FDSA for more than forty years. (*Id.*) He has been personally involved with the FDSA for over thirty years, and he has been a member of the FDSA's Grievance Committee under the applicable CBAs since 1999. (*Id.* at 108.) He also has been a member of the FDSA Negotiating Committee for its CBAs with the Union since 1985, including for the 2002 CBA at issue. (*Id.* at 108–09.) Mr. Sheehy repeatedly testified—again, as a member of the FDSA's Grievance Committee, as appointed by the FDSA President (*e.g.*, *id.* at 110), and as one of the lead negotiators for management on the 2002 CBA—that he understood the Grievance Board to function under the 2002 CBA as the Union contends in the instant litigation. In this regard, Mr. Sheehy explained that, if there is a majority agreement among the Union and management representatives on the Grievance Board, then "that would be end of the, end of the grievance" because the matter would be conclusively resolved. (*Id.* at 113.) Even more explicitly, when asked about the role and authority of the Grievance Board in deciding grievances under the 2002 CBA, Mr. Sheehy credibly testified that if there were a majority position,

> Well, . . . it would be binding. Once the decision is made [by the Grievance Board], then the grievance, depending on whether it was deadlocked or unanimous decision, if it was

deadlocked it would go to arbitration. [I]f it wasn't, then it would be resolved according to the, what the Grievance Committee decided.

(*Id.* at 118–19.) Mr. Sheehy did not recall any discussion during the negotiations of the 2002 CBA about altering the traditional role of the Grievance Board (*e.g.*, *id.* at 109), and he also stressed that he would have opposed any such change as a member of the FDSA Negotiating Committee because it would harm "ma and pop" funeral homes that would lose "a more cost effective way of deciding a grievance, rather than . . . have to hire a lawyer and go through the grievance process that way, through arbitration." (*Id.* at 119; *accord id.* at 118 (explaining that a Grievance Board resolution is helpful because it is more cost-effective).

The last Union witness, who also was testifying pursuant to a subpoena, was Ms. Rosemarie Lamb. (*Id.* at 134.) Ms. Lamb is an employee of SCI, and she has been on both the management and labor sides of the funeral home industry. (*E.g.*, *id.* at 133–34.) Ms. Lamb was a member of the Union Negotiating Committee for the 2002 CBA, as well as for twenty-five years' worth of prior CBAs. (*Id.* at 134) She also had been a high-ranking officer in the FDSA (the management party to the CBAs, of which SCI is a member) when she had been the president and chief operating officer of her family's funeral home, which seemingly was acquired by SCI. (*Id.* at 140–41.) Ms. Lamb had variously been the Executive Vice-President of the FDSA, Treasurer, and a member of the Board. (*Id.* at 141.[5]) She explained that during the negotiation of the 2002 CBA, nothing was discussed about deleting "final and binding" language from the prior CBAs, or about changing the binding authority of the Grievance Board. (*Id.* at 137.) Ms. Lamb

---

[5] Ms. Lamb was a credible witness. She did not exhibit any potential bias, as might at least be possible, by virtue of the fact that SCI bought her family business and now was her employer. Instead, like Mr. Sheehy, she came across as a witness who was not thrilled to be testifying in support of a position that contradicted her employer's, and this enhanced her credibility.

also testified that, as she understands the 2002 CBA, based on her role as a negotiator and as an appointee to Grievance Boards under the prior CBAs (albeit ones that ultimately did not need to sit), if the Grievance Board issues a majority decision, then "that was the decision that should be put in place and followed by both the employee and the Employer." (*Id.* at 137, 139.)

In sum, all of these witnesses offered testimony that was favorable to the Union's position. In particular, the testimony included that of leading Union and management negotiators to the 2002 CBA that they believe the CBA they negotiated provides that majority decisions of the Grievance Board have binding effect, just as they did traditionally under pre-2002 CBAs between the parties. Moreover, there was also testimony that the Union previously has acted in accordance with that understanding.

After the merger of the collecting bargaining agreements, the 2002 CBA no longer expressly includes the words "final and binding" in the section describing the Grievance Board. Article 18, which contains the 2002 CBA's grievance procedure, states:

> If the parties cannot agree, the Issue may then be referred by the Union or by the Employer to the Grievance Board. A written statement of the grievance shall be furnished to the other party setting forth in detail the grievance. The Grievance Board shall be selected within ten (10) business days from the receipt of the written statement of grievance, and shall consist of three (3) people selected by the Association and three (3) people selected by the Union, and shall endeavor to settle the matter. The Grievance Board shall meet within ten (10) business days after being selected and shall render their decision within ten (10) business days after the meeting. If said Grievance Board fails to resolve the matter within thirty (30) business days after it is referred to said Board, the matter may be submitted by the Union or the Employer to arbitration as outlined below. The fees and expenses of the Grievance Board shall be divided equally between the Union and the employer.

(Hrg. Joint Ex. 13 at 39, § 18.2.)

> Arbitration shall be by an arbitrator mutually selected by the Union and the Employer and his or her decision shall be final and binding upon both parties. The Union and the Employer will each be responsible for one half of the cost for such arbitration proceeding. All other expenses of the arbitration shall be assumed by the party incurring them. The

arbitration hearing will not be transcribed except when the arbitrator may deem necessary. At the conclusion of the hearing, the arbitrator will issue a decision with any award in writing.

(*Id.*, § 18.3.)

As explained, the Union's witnesses (including Mr. Sheehy, a leading management negotiator to the 2002 CBA and member of the management Grievance Committee under the 2002 CBA and prior CBAs, as well as Ms. Lamb, one of SCI's own employees) testified at the hearing that the changes in the language arose principally from the fact that the new grievance procedure was "essentially 'cut and pasted' from the Union's agreement governing the Parking Industry." *(See, e.g.*, D.E. 48 at 6.) They variously testified that, like the earlier funeral industry agreements, the parking industry agreement's grievance procedure included final-and-binding decision-making power for the grievance board, even though the words "final and binding" do not actually appear in the "Grievance Board" section of the parking industry agreement. (*Id.*) "Under the Parking Industry agreement, a majority decision by its joint management-union board is final and binding." (*Id.* (citing Tr. 27, 63-64).) The Court will not reiterate the entirety of the testimony cited above, but these witnesses all variously testified to their understanding that the 2002 CBA was not intended to, nor did it, alter the traditional authority of CBA Grievance Boards to issue binding decisions by a majority vote of joint union and management representatives. They also variously testified to behavior of the Union under the 2002 CBA consistent with that traditional understanding, and Mr. Sheehy, the management negotiator, made clear that he would have opposed any attempt to alter the traditional power of the Grievance Boards under the parties' CBAs.

SCI's one witness was its senior corporate counsel, Chris Crouch. Mr. Crouch helped SCI prepare for the Grievance Board hearing at which the six labor and management

representatives unanimously found that SCI violated the CBA by laying off two more senior employee/funeral directors in favor of two individuals with less seniority who also spoke Spanish. (Hrg. Tr. at 144; Hrg. Joint Ex. 24.) Mr. Couch conceded that he had no basis to believe that either SCI specifically or the FDSA generally ever made any proposal during negotiations for the 2002 CBA to change the Grievance Board procedure or to delete "final and binding" language concerning such boards. (*Id.* at 152.) Mr. Couch testified that he was familiar with some two dozen other collective bargaining agreements, and that they all included a non-binding grievance board procedure with subsequent binding arbitration procedures. (*Id.* at 146.) He later conceded that the CBAs between these parties, at least up through the 2002 CBA, traditionally granted final and binding decision-making authority to the Grievance Boards. (*Id.* at 152.)

## DISCUSSION

The issue presented by this case is whether Article 18 of the 2002 CBA between the parties altered the traditional authority of Grievance Boards under their CBAs to resolve, by a majority vote, grievances, or whether the Grievance Board's unanimous decision in this dispute is now advisory only, such that SCI may proceed further before an arbitrator.

## I.    The Parties Both Present Plausible Textualist Positions

Article 18 of the 2002 CBA includes a four-step grievance procedure. The Parties agree that the first two steps, involving meetings between SCI and the Union, failed to resolve the Union's grievance. (D.E. 27 ¶ 10.) When parties to a grievance fail to resolve a dispute in steps one or two, Article 18 provides that "the issue may then be referred by the Union or by the Employer to the Grievance Board." (D.E. 32 ¶ 19.) The Grievance Board is to "endeavor to settle the matter" and is to "render their decision within ten (10) business days after [] meeting."

(D.E. 32 ¶ 20; Hrg. Joint Ex. 13 at 39.) The 2002 CBA further provides that if the "Grievance Board fails to resolve the matter within thirty (30) business days after it is referred to the Board, the matter may be submitted by the Union or the Employer" to arbitration. (D.E. 32 ¶ 26.)

As discussed in this Court's previous minute order denying summary judgment (D.E. 35), both SCI and the Union have presented respectable textual arguments as to why Article 18 should be interpreted in the manner they urge. The Union argues that the language stating that if the "Grievance Board fails to resolve the matter within thirty (30) business days after it is referred to said Board, the matter may be submitted by the Union or the Employer" to arbitration, supports its position that arbitration is unavailable here. Here, the Union argues, the Grievance Board issued a unanimous Union/employer association decision "resolving" the grievance. The plausibility of this textual position is enhanced by the fact that, on the basis of the evidence presented at the hearing, the Grievance Boards function much more like adjudicatory and deliberative bodies and seemingly do not function at all like any sort of mediation board. The Grievance Boards have six members; each side to the dispute gets a chance to present its side of the case, sometimes with the assistance of counsel if they choose; the six members of the Grievance Board question the witnesses or representatives; and then the Grievance Board members deliberate and see if they can reach a majority resolution or if they will, as seemingly is often the case, deadlock. (*See, e.g.*, Hrg. Tr. at 20, 86-87, 89-90, 112-13, 117, 139.) Thus, because the Grievance Board process is not to facilitate a dialogue, or suggest any compromise, the way it "resolves" a dispute, as that matter would be commonly understood—and is in fact understood by the people who negotiated the language and have operated within the Grievance Board process under it—is by reaching a majority consensus within the joint labor-management Grievance Board in the minority of cases where such a consensus is achievable. Such a

14

"resolution," the Union asserts, is binding on the parties and no further arbitration is contemplated by the 2002 CBA, just as always has been the case between the Union and the employer members of the FDSA like SCI. (D.E. 21 at 5-7.) This position is textually plausible, even if that outcome is not required or pellucid.

In contrast, SCI argues that the language in Article 18 of the 2002 CBA supports its position that the rules of engagement concerning such disputes were changed in the 2002 CBA from the traditional and longstanding approach embodied in prior collective bargaining agreements: thus, the Grievance Board's unanimous decision here is only advisory and non-binding and the grievance may now be submitted to an arbitrator. In support of this position, SCI points to the fact that the parties to the 2002 CBA did not to state (at least expressly) in Article 18 that a Grievance Board decision would be "final and binding." Instead, SCI argues, the document only provides (at least expressly) that an arbitrator's decision would be "final and binding on the parties." This language, SCI claims, requires the conclusion that the Grievance Board's decision, even a unanimous decision, as was issued here, is, unlike had traditionally always been the case, merely advisory and that either SCI or the Union still may submit the grievance to arbitration for a "final and binding" decision. (D.E. 28 at 10–13.)

**II.     The Weight of Caselaw and Extrinsic Evidence Supports the Union**

As it relates to the textual interpretations urged by the parties, the weight of caselaw supports the Union, and SCI has not meaningfully distinguished the cases, to which the Court has alluded in prior orders in the case. This caselaw comes from the Northern District of Illinois, as well as from district courts in other jurisdictions.

For example, *Tecam Elec. M.V. Inc. v. Local Union 701 of the Int'l Bhd. of Elec. Workers*, No. 01 C 3333, 2001 WL 1338985 (N.D. Ill. Oct. 29, 2001), analyzed language in a

15

collective bargaining agreement providing that grievances be heard first by a "Labor-Management Committee" and then by a separate "Council on Industrial Relations." *Id.* at *3. Like the 2002 CBA at issue here, the collective bargaining agreement in *Tecam* did not specify that the "Labor-Management Committee" decision would be "final and binding." *Id.* Tecam, the employer, therefore argued on a motion to dismiss that a "Labor-Management Committee" decision rendered pursuant to that agreement was not a final adjudication of its grievances. *Id.* *Tecam* concluded that even though the collective bargaining agreement did not so specify, "decisions by the . . . [Labor-Management Committee] on Tecam's grievances were final and binding on the parties." *Id.* at *4. Other courts have concluded that similar provisions in collective bargaining agreements authorize joint labor-management committees to issue binding decisions subject to judicial enforcement, even when the provisions at issue do not specify that committee decisions are "final and binding." *See Local Union 1253, Int'l Bhd. of Elec. Workers, AFL-CIO v. S/L Construction, Inc.*, 217 F. Supp. 2d 125, 132 (D. Me. 2002) (ordering the parties, subsequent to a bench trial, to abide by a labor-management committee decision where the collective bargaining agreement at issue did not specify that such decisions were final or binding); *Int'l Bhd. of Elec. Workers, Local Union No. 226 v. Wichita Elec. Co, Inc.*, No 04-4028-JAR, 2005 WL 466206, at *3 (D. Kan. Feb. 4, 2005) (finding that the argument that a joint labor-management committee decision is not a final arbitration award where the collective bargaining agreement at issue does not so specify has "'been rejected by every court that has analyzed contractual language identical to the language in the agreement here and has addressed the precise issue before this court—whether proceedings before a Labor-Management Committee constitute final and binding arbitration.'") (quoting *Lackey Elec., Inc. v. Local 226, Int'l Bhd. of Elec. Workers*, 351 F. Supp. 2d 1208, 1212 (D. Kan. 2005)) (also citing, *inter alia, Zorn v. Kans.*

*City Cmty. Constr. Co.*, 812 F. Supp. 948, 953 (W.D. Mo. 1992)) ("This Court believes that action by the Council on Industrial Relations is required only when the Joint Labor-Management Committee deadlocks. It is clear, however, both from the proffered testimony of the plaintiffs and conclusive federal court precedent that decisions of the Joint Labor-Management Committee are also final and binding, and the Court so rules.") (collecting cases).

SCI attempts to distinguish these cases on the basis that they all involve one particular union, the IBEW, which is not the specific labor union involved in this case. (*See* D.E. 47 at 7.) SCI further argues that the cases are distinguishable because there was no evidence in them that the parties' previous agreements contained "final and binding" language in connection with the Labor-Management Committees' decisions, as was the case here; and because there was no evidence that the union had drafted the relevant language in those cases. (*See id.* at 7–8.) With respect, these arguments are not persuasive.

First, nothing in the cases cited above suggests that the interpretation of the collective bargaining agreements in question turned in any way on the particular union or employer involved. To the contrary, courts such as *Tecam*, *Lackey*, and *Zorn* issued relatively sweeping statements that, "as a general proposition, labor-management committee decisions are final and binding arbitration awards." *Tecam*, 2001 WL 1338985 at *3 (citing *Zorn*, 812 F. Supp. at 953); *accord Lackey*, 351 F. Supp. 2d at 1212. The Grievance Board decision in this case was rendered by a board made up of three labor representatives and three management representatives. It was a labor-management committee decision. It fits the cases discussed above, even though it involved a different labor union.

SCI's argument that the cases discussed above, all of which cut in favor of the Union's position here, are distinguishable because there is no evidence that the union in those cases

17

drafted the relevant language, fails for similar reasons. First, this is not a paradigmatic "*contra proferentem* case"—where, for example, an insurer has written a form contract and now wishes to construe ambiguity against the non-drafter insured. The 2002 CBA was the product of a multi-iteration dialogue between experienced labor and management negotiators. (*See, e.g.*, Hrg. Tr. at 59, 69-70.) In addition, while the Union may have written the precise language on which SCI seeks to support its interpretive position, SCI's position is undermined by the fact that the management side negotiator who was representing, *inter alia*, SCI acknowledged that his understanding of how the Grievance Board conclusively "resolves" matters under the 2002 CBA—*i.e.*, by a majority vote, if a majority can be achieved—is the same understanding that the Union suggests here, and is the same procedure that the parties had always employed under their prior CBAs. (*See, e.g., id.* at 118-19.) In fact, the management negotiator, Mr. Sheehy, explained that if anyone had proposed changing the traditional binding authority of a majority vote of the Grievance Board, he would have opposed such a change because it would have harmed "ma and pa" funeral homes. (*Id.* at 119.) Moreover, nothing in the aforementioned cases suggests that the courts were looking to the *contra proferentem* canon of construction (or any other) to aid their interpretation of the agreements in question. To the contrary, the courts do not appear to have found the challenged grievance procedures ambiguous about the binding effect of a majority vote of a joint labor-management grievance board. Most cases agree that the seminal canon is to try to give effect to the intention of the parties to a CBA—*see, e.g., S/L Construction, Inc.*, 217 F. Supp. 2d at 134. Here, particularly where there are plausible textual positions for both sides, such a foundational canon favors the Union; all of the witnesses who were parties to the 2002 CBA negotiations variously testified that they had no intent to alter the parties' traditional approach concerning Grievance Boards, and they further variously testified that they

believe the 2002 CBA Grievance Board process operates as the Union proposes here. (*See, e.g.*, Hrg. Tr. at 19-20, 33, 66, 118-19, 139.)

Finally, and relatedly, the aforementioned cases do not appear to depend on extrinsic evidence for their interpretations, such as that which SCI attempts to use to distinguish this case from them. The fact that there is no evidence in the aforementioned cases of previous agreements that included "final and binding" language in their grievance procedures therefore merits little, if any, weight. This is particularly true given that, to the extent one opens the interpretive field to the consideration of extrinsic evidence, the substantial weight of that extrinsic testimony, including the extensive testimony cited above, decidedly favors the Union. *All* of the testimony concerning the negotiation and operation of the 2002 CBA from the people who actually negotiated it and have been part of the Grievance Board procedure under it supports the Union in this interpretive debate. Thus, while extrinsic evidence can be considered, that consideration favors the Union, not SCI.[6]

---

[6] What was also relevant to the courts in the aforementioned cases was the language of the agreements and, relatedly, the Congressional policy to make arbitration a fast, efficient, and inexpensive substitution to litigation in federal court. *See Tecam Elec. M.V. Inc. v. Local Union 701 of the Int'l Bhd. of Elec. Workers*, No. 01 C 3333, 2001 WL 1338985, at *4 (N.D. Ill. Oct. 29, 2001) (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987) and *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 58 (1974)). SCI appears to attempt to use this policy to its advantage, arguing that the strong policy favoring arbitration supports its position that the grievance should now be referred to an arbitrator. (*See* D.E. 47 at 6–7.) But this argument misses the mark within the evidentiary record presented. The management side negotiator for the FDSA, of which SCI is a member, testified that he believes a majority vote of the Grievance Board under the 2002 CBA operates as it always has in the parties' CBAs—to definitively "resolve" the dispute. (*See, e.g.*, Hrg. Tr. at 118-19.) Moreover, that management negotiator for the 2002 CBA, who also has been a longstanding member of the FDSA's Grievance Committee, also explained that he would have affirmatively opposed any effort to have the 2002 CBA's grievance process operate as SCI proposes here. (*Id.* at 119.) The grievance in this case has already been arbitrated and "resolved"—indeed, unanimously resolved—by the Grievance Board. (*See, e.g.*, Hrg. Joint Ex. 24.) The aforementioned cases are unambiguous in their holdings that "labor-management committee decisions are final and

The Court will not discuss again at length all of the extrinsic evidence supporting the Union's position, as it has been canvassed extensively above. Suffice it to say that the Union presented substantial, credible, unrebutted evidence—from labor witnesses as well as management witnesses testifying pursuant to subpoena—all of which supported the Union's interpretation here. Against this, SCI offered testimony that was, with all respect, of little relevance to the central issues in the case from one of its in-house counsel who played no role in the negotiation of the 2002 CBA. He reiterated testimony that supported SCI's "plain meaning" argument, but as explained above, this is not a case where, at least in the Court's view, either side can definitively prevail on a "plain meaning" argument alone. In sum, the Court believes that the substantial weight of the extrinsic evidence, as well as inferences that should fairly be drawn from it, supports the Union's position that the 2002 CBA did not effect a change in the longstanding and traditional understanding of the parties concerning the effect of majority dispositions (here a unanimous disposition) of the Union/employer organization Grievance Boards.[7]

The Court finds that this case is substantively indistinguishable from the cases discussed above, in which a variety of district courts unanimously have held that majority decisions of

binding arbitration awards." *Tecam*, 2001 WL 1338985, at *3. To re-arbitrate the grievance would frustrate, not further, Congress's policy favoring efficient, inexpensive dispute resolution. *Accord* Hrg. Tr. at 119 (Sheehy testimony).

[7] Contrary to SCI's suggestions, the extrinsic evidence did not relate solely to "unexpressed thoughts" of labor negotiators. Instead, certain witnesses credibly testified that the labor and management negotiators discussed that they intended no relevant changes concerning the traditional powers of the Grievance Boards to be effected in the 2002 CBA. (Hrg. Tr. at 33, 66.) No witness even suggested any contrary expressions of intent. There was also evidence of Union practice under the 2002 CBA consistent with the interpretation the Union offers here. (*Id.* at 19-20.)

labor/management grievance committees are final and binding decisions. *See, e.g., Wichita Elec. Co, Inc.*, 2005 WL 466206, at *3 (finding that the argument that a joint labor-management committee decision is not a final arbitration award where the collective bargaining agreement at issue does not so specify has "'been rejected by every court that has analyzed contractual language identical to the language in the agreement here and has addressed the precise issue before the court—whether proceedings before a Labor-Management Committee constitute final and binding arbitration.'") (quoting *Lackey Elec., Inc.*, 351 F. Supp. 2d at 1212) (also citing, *inter alia, Zorn*, 812 F. Supp. at 953 ("This Court believes that action by the Council on Industrial Relations is required only when the Joint Labor-Management Committee deadlocks. It is clear, however, both from the proffered testimony of the plaintiffs and conclusive federal court precedent that decisions of the Joint Labor-Management Committee are also final and binding, and the Court so rules.") (collecting cases)).

Moreover, even if this substantial federal caselaw did not exist, the evidentiary record in this case squarely favors the Union. It is undisputed that the parties to the 2002 CBA had, for many years previously, provided for the binding effect of a majority vote of the Grievance Board. The extrinsic evidence conclusively supported the conclusion that the 2002 CBA did not, and was not intended to, change this longstanding practice.

The Court therefore interprets Article 18 of the 2002 CBA not to have transformed the parties' longstanding practice concerning Grievance Boards and follow-on arbitrations. The Court finds that Article 18 provides for a union/management Grievance Board that is to issue a final and binding decision if it can. Only where the grievance board is unable to render a decision—*e.g.*, if it deadlocks or fails to convene—shall the parties proceed to arbitration. In this regard, the Court does not believe the text of the 2002 CBA, when read in context and in its

entirely, commands a clear result, despite the parties' respective and competing "plain meaning" arguments. The Court further finds that the extrinsic evidence offered by the parties—and in particular the testimony in support of the Union's interpretive position offered by both labor-side and management-side negotiators to the 2002 CBA—weighs in favor of the Union here. The Court's conclusion, as noted immediately above, also is consistent with the extensive district court caselaw addressing analogous interpretive disputes.

Finally, although certainly not material to the Court's resolution, the Court notes that, despite SCI's speculations and innuendo to the contrary, there is no credible evidence that the procedures followed to resolve this grievance were unfair. SCI argues in its post-trial briefing that the Grievance Board, as structured, is generally and necessarily biased towards the Union because it is always composed of three Union representatives—who, SCI suggests, despite record evidence to the contrary (*see* Hrg. Tr. at 19) invariably vote in favor of labor—and three competitors of the particular employer involved in the grievance, who, as competitors, would supposedly have no financial incentive to see things the employer's way. (*See* D.E. 49 at 3.)

This speculation by SCI has no grounding in the evidentiary record or in logic. First, as a matter of fact, the record shows that the one time a Grievance Board under the 2002 CBA has rendered a majority disposition, that ruling was in favor of the employer. (Hrg. Tr. at 19.) This evidence cuts against any suggestion that labor representatives will only vote for labor. Moreover, that pro-management result, combined with the fact that on other occasions prior to the SCI seniority-lay-off dispute at issue in the underlying proceedings here, the respective Grievance Board deadlocked, shows that management representatives are not reluctant to support the employer-company at issue. (*Id.* at 19-20.)

Likewise, the record refutes SCI's suggestion that something untoward should be inferred from the fact that the employer involved in a grievance will not be represented by an officer or manager in the Grievance Board that is convened. The record reflects that both the Union and the FDSA employ the common-sense practice of not having a representative from the specific employer or the business agent who was involved in the underlying dispute serve as representatives on that specific Grievance Board. (*See id.* at 18 (Union officer's testimony that, "You would never use a business agent [on the Grievance Board] who was involved in the case."); *id.* at 111 (testimony to same effect of FDSA leader).) The Union and FDSA both employ this practice for the reason that it avoids, as Mr. Sheehy, the management negotiator on the 2002 CBA and a longstanding member of the FDSA's Grievance Committee, explained, an obvious "conflict of interest" that otherwise would be presented. (*Id.*)

In addition to the record evidence conclusively undercutting SCI's suggestion that the traditional and longstanding Grievance Board process is unjust, SCI's position—i.e., that management representatives will side with labor so they can gouge a competitor—is not even sensible as a generic proposition. SCI offers no evidence or basis to conclude that management-side representatives are both sufficiently unjust and sufficiently ill-advised to be part of a dispute-resolution process that will, through their votes, slowly but surely tilt the playing field in their industry to labor. Even the most unjust hypothetical management representative—and SCI offers no evidence *whatsoever* to support the idea that management (or labor) representatives have acted in an unjust or unethical manner under the 2002 CBA or any other CBA—will appreciate that if labor is slated to win every time, labor will have substantial incentives to file *seriatim* grievances in which they will always prevail. As the old saying goes, "what goes around, comes around," and management representatives have no incentive to start or be part of a process in

23

which employers systematically will be treated unfairly. SCI is ultimately left with the fact that, while employer arguments are often credited by employer representatives, the labor/management Grievance Board here unanimously found that SCI violated the 2002 CBA by laying off more-senior employee/funeral directors in favor of less-senior employee/funeral directors. That is not, with all respect, any evidence of procedural unfairness in the dispute resolution procedure the parties have traditionally employed in their industry.

**III.    The Court Orders Enforcement of the Grievance Board's Unanimous Decision**

It is apparent that the Grievance Board's decision here was intended to resolve the dispute fully. The Grievance Board issued an order requiring SCI to reinstate all bargaining unit employees who were laid off out of seniority, and to issue them back pay. (See Hrg. Joint Ex. 24.) Therefore, the Union has properly characterized the decision of the Grievance Board as final and binding. *See S/L Construction, Inc.*, 217 F. Supp. 2d at 132. This conclusion is based on the language of Article 18, the IBEW cases discussed *supra*, and the extrinsic evidence presented by the parties.

**IV.    The Court Denies Any Request for Fees Against SCI**

The Union in a post-hearing filing makes a cursory request for attorneys' fees. (D.E. 48 at 8.) The Court agrees with SCI that the propriety of such an award has not been demonstrated. SCI also offers caselaw suggesting that an attorneys' fee award in this labor context is appropriate only where the other side's position was frivolous or in bad-faith. (D.E. 49 at 5 n.4 (collecting cases).) The Union has offered no caselaw to the contrary. Any request by the Union for attorneys' fees is denied without prejudice. If the applicable standard is as SCI suggests, the Union has shown no basis for an attorneys' fee award. SCI has not prevailed, but the Court does not believe its position was frivolous, nor does the Court believe it was advanced in bad faith.

## CONCLUSION

For the reasons given above, the Court enters judgment in favor the Defendant Union and against the Plaintiff-employer, SCI.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: 6/25/07